```
                UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF VERMONT

UNITED STATES ex rel.           :
LISA STEARNS,                   :
    Plaintiff,                  :
                                :       Case No. 2:08-cv-175
    v.                          :
                                :
RASHIED LANE,                   :
    Defendant.                  :
```

**MEMORANDUM OF DECISION**

Relator Lisa Stearns filed a *qui tam* action under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, against her former landlord, Rashied Lane.  Stearns alleges that she paid Lane unauthorized payments for rent and water service in addition to the rent he was entitled to receive under the federal Section 8 Tenant Based Housing Choice Voucher Program ("Section 8 Program").  The United States elected not to intervene in the action.  The Court conducted a bench trial on January 7, 2010.  This memorandum constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.

I. **Findings of Fact**

Stearns received a Section 8 voucher for housing through the Burlington Housing Authority ("BHA") in December 2006.  The Section 8 Program is run by the United States Department of Housing and Urban Development ("HUD"), who enters into contribution contracts with housing authorities such as BHA.  In turn, BHA enters into a HUD-approved contract known as a Housing

Assistance Payments ("HAP") Contract with landlords of existing dwellings in the local community.

In November 2006, Stearns asked BHA to approve Lane's premises at 90 Oak St., Burlington, Vermont for a Section 8 subsidy. When applying to BHA, Stearns listed the rent for 90 Oak St. as $1,100.00, and $50.00 for water. This is the amount Lane had advertised, and Stearns had agreed to pay. On her application to BHA, Stearns falsely represented that her husband would not be residing with her, in order to avoid having his disability payment included in the calculation of her portion of the rent.

As of December 1, 2006, BHA had not yet approved the premises for a section 8 subsidy, but Stearns moved in as a private tenant and signed a lease for $1,100.00, and $50.00 for water. Lane made two different copies of this lease with Stearns, one which stated that Stearns had paid the security deposit, which was required in order gain BHA's assistance, and one that stated that only $154.00 had been paid, as was actually the case.[1] Lane undertook these actions with the intent of helping Stearns, whom he considered a friend.

On December 6, 2006, BHA approved a HAP contract for the 90 Oak Street apartment. The HAP contract established a total

---

[1] Stearns eventually paid all or most of the December 2006 rent and security deposit, but not until March 2007, with help from the local non-profit Committee on Temporary Shelter ("COTS").

allowed monthly rent, which is computed by BHA in accordance with HUD guidelines.  In this instance, the guidelines set the rent at $1,081.00, including water charges and trash removal.  This represented $69.00 less per month than Stearns had agreed to pay Lane in their original contract.  The HAP contract also required that Lane make certain repairs to the premises.

Under a HAP contract, the tenant's share of the rent is established by HUD guidelines and limited to 40% of his or her income.  The remainder of the rent is paid by BHA.  In the instant case, Stearns's share of the rent was $48.00 per month, and BHA's share was $1,033.00 per month.[2]  If Stearns had been truthful about residing with her husband, her share of the rent would have been approximately $400.00 higher per month, because BHA would have included her husband's disability payment when calculating her ability to pay.

Under the Section 8 Program, the landlord and tenant must sign a lease in addition to the HAP contract.  This lease must be approved by BHA and conform to the HAP contract.  The tenant may enforce against the landowner any right or remedy under the lease, also called a tenancy addendum, and its terms prevail over conflicting lease terms.  Lane wrote a lease with $1,081.00 listed as the rental amount, and this lease was executed by both

---

[2] The rental amount for January 2007 was prorated to $1,000.00 because the lease started on January 2, 2007.

Stearns and Lane.

During this process, Lane informed Stearns that he would need to receive the full amount contained in their original lease agreement, $1,100.00 plus $50.00 for water, in order to stay financially solvent.  Lane then gave Stearns the option to leave the apartment.  Stearns stated that she wanted to stay and pay the full amount in the original lease, but still wanted to receive the benefits of Section 8 housing.  Stearns then stated she would pay Lane an extra $69.00 per month, such that he would receive the original rental amount, and that she would stay in the apartment.

In January 2007, BHA entered into a HAP contract with Lane for the term January 2, 2007 through December 31, 2007.  Stearns and Lane modified their rental agreement to reflect the new dates.  Stearns lived in Lane's apartment for all of 2007.  BHA paid Lane the amount of $12,396.00 ($1,033.00 per month, with $1000.00 for January) for the months of January through December 2007.  For those same months, Stearns paid Lane one payment of $48.00 for her portion of the HAP contract rent, and a second payment of $69.00 to cover the additional $19.00 of original rent, and $50.00 for water.  Stearns did not tell BHA that she was paying Lane any additional money during this year, nor did she inform BHA that her husband was residing with her.

As the year continued, Stearns's husband began acting

violently and threatened to destroy property at the apartment. Lane told Stearns that she needed to tell BHA about her husband's presence and get him on the lease.  After several months, Stearns finally informed BHA that her husband was residing with her, and her contribution to the rent for the next year under Section 8 rose from $48.00 per month to $480.00 per month as a result. Stearns was angry about the extra cost, and decided to report her extra payments to Lane from the previous year.

Stearns reported the side payments to BHA in December 2007. On December 21, 2007, BHA terminated the HAP contract.  According to section 9 of the HAP contract, if the HAP contract terminates, the lease terminates automatically.  Stearns has not made any additional payments since December 2007.  The total of these additional payments is $828.00.  Stearns did not pay rent for January, February and March 2008, and paid $480.00 in rent for April 2008 only after a state court order.  Stearns and her husband moved out of the apartment on May 12, 2008.  They did not pay rent for May.

## II.  **Conclusions of Law**

Stearns alleges two counts against Lane.  Count I is a claim under the FCA, 31 U.S.C. § 3729.  Count II alleges a breach of Vermont's Consumer Fraud Act, Vt. Stat. Ann. tit. 9, §§ 2451-2461.

A.   <u>False Claims Act</u>

   1.   <u>Statutory Structure</u>

Under Count I, Stearns, as relator, requests that the Court find that defendant Lane violated the FCA.  The FCA, 31 U.S.C. § 3729(a)(1), as amended on May 20, 2009, and made retroactive to June 7, 2008, provides:

> [A]ny person who (A) knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim . . . is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus three times the amount of damages which the Government sustains because of the act of that person.

The essential elements of a FCA claim include: "1) a false statement or fraudulent course of conduct; 2) made with scienter; 3) that was material, causing 4) the Government to pay out money or forfeit monies due."  *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006).  The regulations that govern the payment of rent under a HAP Contract are contained in 24 C.F.R. § 982.451.  Subsection (b)(4)(ii) states: "The owner may not demand or accept any rent payment from the tenant in excess of the maximum and must immediately return any excess rent to the tenant."  §982.451(b)(4)(ii).

   2.   <u>Violations of the False Claims Act</u>

Lane admits that he cashed checks from BHA while he was receiving additional rent from Stearns, and that he knew he was

not supposed to accept such extra payments.  When Lane cashed each check, he implicitly certified that he was not getting any additional payments.  "An implied false certification claim is based on the notion that the act of submitting a claim for reimbursement itself implies compliance with governing federal rules that are a precondition to payment."  *Mikes v. Straus*, 274 F.3d 687, 699 (2d Cir. 2001).  The theory applies "only when the underlying statute or regulation upon which the plaintiff relies *expressly* states the [claimant] must comply in order to be paid."  *Id.* at 700.

The HUD regulations expressly require as a condition of the HAP contract that the owner not demand or accept any additional payment from the tenant.  See 24 C.F.R. § 982.451(b)(4)(ii).  Lane's endorsement and presentment of the housing assistance payment checks, while he knowingly received additional payments in excess of the approved amount from BHA, thus constitutes false claims or representations to the Government.

Because Lane knowingly certified that he was not receiving additional rental money, the statement was material, and this caused the Government to pay out money, the essential elements of FCA liability have been met.  *See United States ex rel. Hendow*, 461 F.3d at 1174; *accord United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376

(4th Cir. 2008)).

        3.   <u>Damages under the False Claims Act</u>

Lane violated the FCA by accepting additional rental payments while receiving money from the Section 8 Program. Each violation of the FCA gives rise to separate liability. *See, e.g.*, *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993) (holding that the number of FCA claims equals the number of fraudulent acts committed by the defendant); *Coleman v. Hernandez*, 490 F. Supp. 2d 278, 281 (D. Conn. 2007) ("Liability attaches for each false claim submitted."). Lane is therefore liable on each of the twelve BHA checks he endorsed.

In *Coleman*, the court discussed appropriate ways to measure the government's damages under the FCA in a case involving Section 8 payments, noting that the Second Circuit has not specifically addressed this issue. *Id.* at 281-82. On similar facts it concluded that, because the purpose of the statute is to make the government whole, the proper measure of damages was the "amount that [the government] paid out by reason of the false statements over and above what it would have paid if the claims had been truthful." *Id.* at 281 (quoting *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003)). Following this logic, the government's damages equals $828.00, the total of twelve months of additional payments of $69.00.

4.  <u>Penalties under the False Claims Act</u>

The FCA provides for treble damages and civil penalties of $5,500.00 to $11,000.00 per violation.  31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(9).  For a total loss to the government of $828.00, treble damages would total $2,481.00, and the potential civil penalties would run from $66,000.00 to $132,000.00.

The Eighth Amendment's Excessive Fines Clause limits the government's ability to obtain payments as punishment for an offense.  *Alexander v. United States*, 509 U.S. 544, 558 (1993); *Austin v. United States*, 509 U.S. 602, 610 (1993).  "An award of treble damages and civil penalties under the FCA is, at least in part, punitive and subject to the Eighth Amendment's Excessive Fines Clause."  *United States v. Bourseau*, 531 F.3d 1159, 1173 (9th Cir. 2008).  Such an award will violate the Excessive Fines Clause if it is grossly disproportional to the gravity of the offense.  *Id.*  A penalty that represents between 82 and 162 times the government's actual damages in this case is grossly disproportional.

As a district court wrote in a case with similar facts:

> [O]ne does not normally expect a landlord to consider the terms of the rental agreement for an inexpensive residential apartment each time a rent check is cashed. The cashing of the rent check is a certification only as a result of the contract with the housing authority. While that is sufficient to impose liability under the statute, the Court finds the penalty for the cashing of the checks to be extremely harsh and unjust.

*United States ex rel. Smith v. Gilbert Realty Co.*, 840 F. Supp.

9

71, 75 (E.D. Mich. 1993). This Court agrees. Balancing the government's harm against the size of the potential penalty, *United States v. Ursery*, 518 U.S. 267, 284 (1996), the Court concludes that, given the proportionally small amount of money Lane received in additional payments, treble damages and civil penalties would constitute excessive fines under the Eighth Amendment.

Moreover, extenuating circumstances favor confining the recovery in this case to the government's actual damages. Stearns initiated the fraud; she induced Lane to commit the fraud by playing on his sympathies and trading on his friendship; and she committed a considerably larger fraud against the BHA, for which she has apparently escaped any penalty.

### 5. Payment to Lisa Stearns as Relator

Under 31 U.S.C. § 3730(d)(2), a relator "shall receive an amount which the court decides is reasonable for collecting the civil penalties and damages," that is between 25% and 30% of the proceeds of the action. 31 U.S.C. § 3730(d)(2). The relator is also entitled to reasonable expenses, plus reasonable attorneys' fees and costs. *Id.*

However, if a relator planned and initiated the FCA violation, "then the court may, to the extent the court considers appropriate, reduce the share of the proceeds of the action which the person would otherwise receive . . . . *Id.* § 3730(d)(3).

Stearns planned and initiated the scheme to stay in the apartment and to pay the Lane full amount of rent in the original contract. Stearns also engaged in a separate fraud by hiding her husband's cohabitation to avoid paying additional rent and misrepresenting payment of the security deposit.  As a consequence, the Court reduces Stearns's award to zero.

In addition, although Stearns nominally prevailed in this suit, she prevailed because Lane immediately admitted that he had received the extra payments, and that he knew he should not have done so.  The facts strongly suggest that Stearns brought the case to retaliate against Lane for insisting that she report that her husband was residing with her, which triggered a higher tenant contribution to the subsidized rent.  Under the circumstances it is inappropriate to award Stearns expenses, fees or costs.

B. <u>Vermont Consumer Fraud Act</u>

In Count II, Stearns alleges that Lane's knowing, willful, and intentional demand for and acceptance of additional payments for rent and water, as described above, constitute a violation of the Vermont Consumer Fraud Act.  *See* Vt. Stat. Ann. tit. 9, § 2453.  She seeks compensatory and exemplary damages in the amount of $5,628.00, representing actual damages, treble damages, and attorney fees.  *Id.* § 2461(b).

The allegations of fraud under the Vermont Consumer Fraud

Act, Vt. Stat. Ann. tit. 9 §2453, concerning the additional payments of rent, are unfounded.  Section 2461(b) provides that [a]ny consumer who contracts for goods or services in reliance upon false or fraudulent representations or practices . . . or who sustains damages or injury as a result of any false or fraudulent representations or practices . . . may sue and recover from the . . . violator the amount of his damages . . . .  Vt. Stat. Ann. tit. 9, § 2461(b).  Lane made no false or fraudulent representations.  Lane told her the rent; Stearns agreed to pay the rent; Stearns decided to obtain Section 8 assistance; the BHA approved a HAP contract for rent that was less than their agreement; Lane said he needed the full amount and offered to terminate the tenancy; Stearns offered to pay the extra rent on the side.  Assuming without deciding that Lane's receipt of side payments constituted a fraudulent practice, Stearns did not execute the lease in reliance upon the side payments, nor did she sustain injury as a result of paying Lane the extra money, since it enabled her to remain in the apartment.  There is no basis for liability under the Vermont Consumer Fraud Act.[3]

## IV. Conclusion

Both Stearns and Lane engaged in fraudulent behavior connected with the rental premises at 90 Oak Street in

---

[3]  In a third count, Stearns alleged that Lane had knowingly, willfully and intentionally diverted electric power from her metered account to his own use.  She has abandoned this claim.  (Tr. Mem. 17.)

Burlington, Vermont.  They both violated Section 8 regulations when they made an agreement that Stearns would make up the difference between the rent payment she had first agreed to pay and the amount that was allowed by BHA.  Furthermore, Stearns committed fraud by hiding her husband's cohabitation in order to avoid having to pay a higher share of the rent, and misrepresenting the status of payments.

The Court holds that Rashied Lane is liable to the United States Government in the amount of $828.00 on Count I.  Lisa Stearns's share of the proceeds is reduced to zero.  No expenses, fees or costs are awarded.  Counts II and III are dismissed.

Dated at Burlington, in the District of Vermont, this 15th day of September, 2010.

<u>/s/ Honorable William K. Sessions III</u>
William K. Sessions III
Chief Judge
United States District Court